at all. We have Mr. Nehart. I see you reserved three minutes for rebuttal. You can begin whenever you're ready. The protocol we're following is that when you're arguing, you can take off the mask if you wish, and when you're not, when you're done arguing, you should put the mask back on. Thank you. May it please the court. My name is Brian Nehart. I represent Emily Carpenter and her photography studio, Emily Carpenter, LLC. Ms. Carpenter creates stories celebrating marriage and other topics through her photographs and blog posts. As an artist, Ms. Carpenter always considers the message a request asks her to convey, rather than the status of the person making the request. And like other artists, Ms. Carpenter desires to earn a living by creating expression consistent with her beliefs and her values. The First Amendment protects this choice, just as it ensures that an LGBT artist can refuse to create artwork criticizing same-sex marriage. The district court assumed that strict scrutiny applies in this case because New York's laws compel Ms. Carpenter to speak messages that violate her beliefs. But the court held that New York's laws passed strict scrutiny at the motion-to-dismiss stage. That is clearly reversible error. At the pleading stage, courts must accept the allegations in the complaint as true and construe them in the plaintiff's favor. Can you explain to me how the record could be developed further, assuming it is compelled speech, would arm the strict scrutiny? What type of development of the record could happen? Narrowly tailoring, you know, what aspect of the strict scrutiny analysis would the district court have to gather additional information on? Yes, Your Honor. If we're talking about strict scrutiny and the additional evidence that needs to be submitted, we're talking under the preliminary injunction standard. And so that's different from the motion-to-dismiss standard, where the court cannot consider evidence outside of the four corners of the complaint. But in terms of the motion for preliminary injunction, New York has the burden to demonstrate that it has a compelling interest in refusing to grant a specific exemption for Ms. Carpenter. And it has to show that it considered alternatives to compelled speech. Let's break that down. On the compelling interest part, they would say it's a compelling interest to protect against discrimination. Do you agree with that? Based upon sexual orientation, that's a compelling interest. You don't really develop the record on that, right? Well, Your Honor, I agree that in general, preventing sexual orientation discrimination is a compelling government interest. What the Supreme Court has said is that courts need to look beyond a generally formulated interest and look to the specific context of a specific case. And so in this case, New York would need to present evidence that it has a compelling interest in regulating Ms. Carpenter's specific speech. And so if you look through the legislative history and the evidence that New York provided on the preliminary injunction stage, there's no evidence there that it has a specific interest in regulating a photographer in this context. Isn't that dovetailing with the narrow tailoring issue? Whether or not they need to regulate her or not would depend upon what the options there are, right? Your Honor, if we get to narrow tailoring, then I think the narrow tailoring analysis that the district court has adopted and New York has adopted is a dangerous one because it basically says that the narrow tailoring analysis applies to Ms. Carpenter because she is a unique photographer that engages in unique expression. And so that would essentially allow New York to regulate any artist because of their unique expression. But even before we get to narrow tailoring, New York's general interest is in ending discrimination. And in this particular case, Ms. Carpenter has a First Amendment message-based objection to creating certain messages. And so even before getting to narrow tailoring, New York's anti-discrimination interests don't fit as applied to Ms. Carpenter. And so I think the right framework to consider in approaching this issue is Hurley. Hurley said that a law that facially regulates conduct generally serves in an interest. When that law is applied in a particular way to compel speech, then the First Amendment protects the speaker. One of the issues here is where would the limits be? So let me give you a hypothetical. So you have a white supremacist who does not want to photograph, who's a wedding photographer, does not want to photograph interracial marriages. Is that protected or not? That would not be protected under our theory, Your Honor, and here's why. The Supreme Court has said that objections to interracial marriage is a very different context than objections to same-sex marriage. And so, for example, in the Loving v. Virginia case, the court described objections to interracial marriage as based on invidious racial discrimination that's designed to maintain white superiority. That's essentially a quote from Loving v. Virginia. By contrast, in Obergefell, the Supreme Court said that people can have decent and honorable religious and philosophical objections to same-sex marriage. And so under our theory, the state's interest would be very different in the racial context than in this context. So in your theory of the free speech analysis, at which point in the analysis do we differentiate between sexual orientation and other categories that New York has chosen to protect? I think that would be in the compelling interest section based on the government's asserted interest in the case. And in the free speech analysis, does it matter that the objection here is religious-based? And if so, where in the analysis does that come in? I think, Your Honor, the religious-based objection is also based on the message. And so for the free speech analysis, I don't think the religious-based objection necessarily plays in because the First Amendment protects messages generally. I think that would play an analysis in the free exercise. Right. But so in the speech context, whether the objection is secular or religious has no bearing. That's correct, Your Honor. So if the photographer's basis for objection is anti-Semitism, same analysis, same outcome under your theory? You'd have to walk through some of the factors that we've discussed in our brief. Sure. And assuming that it was a legitimate message-based objection. So assume all the same facts of your case, but the only difference is the objection is a secular-based anti-Semitic or anti-Catholic view. Right. And then you'd also have to go to the next part of the analysis, which would be whether the request actually asked the speaker to create a message that's inconsistent with those views. And so I think in terms of limiting principles- So for my version, I'm just trying to see if there's any point in the analysis where it matters, just on the free speech claim. Sure. The basis for the objection, so a secular person who holds anti-Semitic views refuses to photograph Jewish weddings. Right. Same outcome under your theory. Yes, then the government had the burden under strict scrutiny to walk through the analysis in that context. And under your theory, they would fail. Well, it would depend on the evidence, but I think in general- I'm just saying otherwise exactly the same as your case. Then yes, they at least could pass motion to dismiss and onto the preliminary injunctions standard. That's correct. And I think in terms of limiting principles here, New York has a certain- So you think that might be protected? Yes. Yes, Your Honor. Under our theory, I think that's right. But I think it's important when you're talking about limiting principles to also consider New York's theory and how that works and how that would play out. And so, for example- We'll ask them to. Sure. So let me just offer a couple of examples. New York has said that it has an ability to regulate the speech of public accommodations when they become public accommodations. New York's law also broadly defines public accommodations to include all types of things. So, for example, if a speechwriter offered her services to the public, creating speech and writing speeches, and that speechwriter was a pacifist, she could be required to write a speech celebrating war, celebrating the military, for a military veteran at a high school ROTC event. Or, for example, if an atheist singer who sang at birthdays or corporate events was asked to sing at an Easter service for a church, under New York's theory, they would have to sing at that church service just the same as they would sing in other services as well. Can I ask you a practical question? The Supreme Court has obviously granted cert, and the argument's yet to be scheduled, but you can correct me if I'm wrong. At least on the free speech claim, it's identical to what we have before us. Would you agree with that? I mean, there's no way they could decide that case in a way that would not be instructive, in this case, as to your free speech claim. I agree there's similarities, Your Honor, and so I agree that they present the same issue. What I would say, though, is in this- Why shouldn't we wait for the Supreme Court? Right, so I think there's a couple of reasons why not. The first one is under the preliminary injunction standard. Our position is that Ms. Carpenter is currently suffering irreparable harm by refraining from speaking on topics that she'd like to speak about. And also, New York has said, and the county has said- She's able to conduct her business in the meantime, right? There are certain things that she would like to say that she is not now saying for fear of prosecution, but she's able to conduct her business. Isn't that right? That's correct, Your Honor. Both New York and the county have both said that they have a compelling interest in enforcing the penalties of its law against Ms. Carpenter. And Ms. Carpenter continues to receive the requests, continues to operate her business consistent with her religious beliefs. And so every day that she operates her business is another day that she's threatened by these penalties. And the penalties here are very severe, kind of going back to the limiting principles here. New York's penalties include $100,000 fines, potential jail time, loss of business license, and other penalties that cause Ms. Carpenter irreparable harm. That's why we'd ask- Counsel, also on limiting principles, so we've talked about the protected categories, the basis for the objection. Obviously, the complaint alleges Ms. Carpenter's photography as an artist, and you've described that. Are there, outside of the wedding context, any photographers who aren't artists? I don't think so, Your Honor. Under this court's decision in Berry v. City of New York, the court has said that photography is presumptively protected by the First Amendment. So, same outcome for any kind of photography outside of the wedding context, otherwise all the same facts as your case? Right, so in the colloquy we had about all the same facts, everything else being the same as this case, going through the factors, then that's correct. If it's a message-based objection, that's correct. And then in the wedding context, is there any vendor or service that wouldn't meet your definition of artist or expressive speech? Absolutely, Your Honor. I think, you know, one of the limiting principles here is first you have to have some sort of speech involved.  So just give us an example from the wedding context. Right, so the caterer, for example. So a caterer, not a caterer who blogs about how the food celebrates the particular wedding. No, Your Honor, because the service that the caterer is providing is food, and that does not necessarily convey any message. You say not necessarily, but maybe, depending on the views of the caterer? The caterer, no. I think the caterer is clearly out. And even if they blog about the story that their food tells, if they provide that for opposite-sex couples, they have to provide it for same-sex couples. That's right, Your Honor, because what the courts do, and this is what the Hurley court did, and I see that I'm out of time, but if I may continue, is you first look to what is actually the service being provided, and is the service being provided speech or conduct? How about florist? Florist is a closer case. I think there could be circumstances where the florist creates a custom floral arrangement specifically designed to celebrate the marriage, and so in that context, yes. Why isn't that true for catering? A custom message that conveys love and friendship and the like through food? Well, I don't think food generally expresses any message, so I don't think that— Is that a factual question, or how do we go about it? You said you don't think, so how do we determine that? Well, I think out of the speech context, and there's a particular test that you would apply, and we're talking about kind of potential expression outside of the speech context. At first, you'd say whether there's an intent to convey a message, and then secondly, whether someone would reasonably understand that the thing being produced communicates a message, and I don't think anybody— So like an objective observer test? Yes, that's correct, and I don't think anyone seeing barbecue at my wedding, no one would see that as speech, so I don't think that would apply in that context. How about a videographer who just puts it on a tripod, and it's just filming the wedding? Does that fall within this category or not? Is that more just providing no creative expression, just historical video of the wedding? Right, just kind of setting up a camera and seeing what happens. I think obviously Ms. Carpenter's photographs are different, so we're in a different situation there, but I think also this court's opinions in Berry v. City of New York and Master Vincenzo v. City of New York kind of provide the right framework for that. I think generally videography would be presumptively covered under free speech because videos and films typically convey a message, but under Master Vincenzo, there may be exceptions to that. Simply setting up a camera, pushing a button and letting it roll might be the outer contours of the free speech. How about—and we don't need to do a million of these, but I have a specific— Sure. How about like a sign maker or the invitation calligrapher? Right, so I think signs convey words and text on the sign, and so I do think that that would be protected in the sense of if they're asked to write something on the sign that they would object to. And again, flipping the hypothetical in that situation, for example, New York shouldn't be compelled to allow a gay sign maker to create a sign that says defend marriage if it was going to be used for a church event if you would make the same sign for an LGBT event. And so I do think the sign protector in both cases is protected, and that's an important point is that the First Amendment applies both ways in this context to protect speech of all kinds. Just the reason I was asking that, so in your view Hurley is the same outcome if it's not the parade organizers objecting to the banner of the LGBT group, but the sign maker who makes the sign for—who has a business of making signs for any Congress? Right, so assuming all those factors that we've already talked about and assuming it is an objection to the message that he's being asked to put on the sign, then yes, that would apply in that context as well, Your Honor. All right, thank you. Okay, thank you. All right, we'll now hear from Mr. Lange. Good morning, Your Honors, Jeffrey Lange on behalf of state defendants. New York public accommodation laws ensure that businesses that generally serve the public give all persons full and equal access without regard to their sexual orientation, among other protected characteristics. So for the free speech claim, we think the proper analysis is actually intermediate scrutiny. Mr. Lange, before you get into the doctrinal analysis, could you address the question that Judge Bianco raised about how we should deal with the fact that the Supreme Court is reviewing 303 creative, which presents somewhat similar facts and questions to those presented here. What would the state's view be about enforcement in the interim period? Were we to wait for a decision in that case? Well, this was a pre-enforcement case that was brought, so there is no current enforcement. I mean, I'm not in a position to say that the state will forbear enforcement. You know, we won in the lower court. What I would say about 303 creative is that, you know, we would ask the court to go ahead and decide this case. It would provide the Supreme Court with an important precedent from a circuit court that the Supreme Court could take into account in its decision making as it saw fit. So we would ask this court to go ahead and decide this case. Okay, thank you. I'm having a hard time understanding why this is not compelled speech. I know you're arguing for intermediate scrutiny. The district court assumed strict scrutiny, found it dissatisfied. Even the Tenth Circuit found it to be compelled speech. It's pretty clear, I think, that it's not based upon the protected characteristic of the customers here. So I know you're arguing it's conduct or the speech is incidental. But let me take a broader example, because Ms. Carpenter is focused exclusively on wedding photography. Branding, I guess, is another aspect of her business. But suppose you had a photographer who photographs all sorts of events and says, I don't care what the protected characteristics are of any customer. I just won't photograph same-sex marriages. Why is that not content-based then if the state says, no, you must photograph same-sex marriages? Well, that would be a status-based, I mean, that's discrimination. What you've just described is discrimination on the basis of- It's not based upon status because if an LBGT person walks in and says, will you photograph my daughter's graduation? The answer to the photographer would be, sure. I don't discriminate against people based upon their sexual orientation. I just don't want to produce, I don't want to use my expressive content for a particular message that I don't believe in. Well, respectfully, Your Honor, we cite these precedents in page 49 of our brief. But the Supreme Court has said that when you have conduct, and other courts, when you have conduct that is so closely tied to a status, so here, same-sex marriage, which is very closely tied to sexual orientation, then that counts as discrimination on the basis of sexual orientation. I thought Hurley said the opposite. I thought Hurley said if you're, basically, the accommodation is to force speech, that's no good under the First Amendment. Isn't that what Hurley says? No, Hurley did not say the opposite. Hurley was very different. Hurley concerned an expressive group itself. And, in fact, the court in Hurley said Massachusetts has applied its public accommodation laws in a very peculiar way to the parade itself. The parade itself was the public accommodation. Does New York consider parades a public accommodation? I actually don't know if they would be considered a public accommodation. Obviously, New York would be bound by Hurley and so would not apply its law in that case. So, at some point, New York will have to answer whether something is more like Hurley or more like fair, whether it's like a parade in some way, unless you read that peculiar language in Hurley to mean only parades. Well, it's not only parades. So, I mean, Hurley and Dale v. Boy Scouts of America, it's the same thing. What was important in those cases is that it's an expressive association. And forcing someone to include a member in your association or forcing a group to post a message- But Hurley cited a series of cases that went well beyond that. For example, the Tornillo case from the Supreme Court dealt with a newspaper, not a private association, and said just because they print something derogatory about the candidate, they can't be compelled to have to allow somebody else, that candidate, to say something in response. So, I'm having a hard time understanding why Hurley is somehow limited to that particular context. Well, I think the example that you just gave is just a more straightforward example of compelled speech. I mean, the only thing I would say on this, because I think we do survive under strict scrutiny and I'd like to get there, but, I mean, this court in the Jews for Jesus case already said that New York's public accommodation laws are subject- The Jews for Jesus case was a boycott. That was clearly conduct. They were boycotting to cancel a contract. I don't think you can put that in the same category as this case, right? Well, what the court said is that discrimination on the basis of race or religion is conduct. It's discriminatory conduct, and, you know, what's happening here- Let's just assume, as a district court, that it's strict scrutiny. I guess the first question I would ask is, is it a proper thing for the court to have resolved on a motion to dismiss? I don't think, you know, first of all, the Supreme Court has never found compelled speech to satisfy strict scrutiny. So, you know, it's a pretty unusual analysis, I guess, that you would be applying here. But why shouldn't there be a development on the record about what other states have done, what other options there are? You know, there's Florida, Mississippi, Nebraska, a narrow tarrowing. Well, when the legislature passed added sexual orientation in 2003, it had before it a substantial record about the history of discrimination and prejudice. I understand that. It's a compelling interest, obviously, to prevent discrimination, including sexual orientation discrimination. But on narrow tarrowing, there's no record. In fact, the district court used a justification, as they pointed out, that every photographer is unique, which I don't even think you argued. I think the district court came up with that independently, and there was no record on other options, what other states have done. So isn't that really just taking that requirement out of the equation? I think when you understand there are two compelling interests here. One is the full and equal access of goods and services to all, so no limited menus. The second compelling interest is the dignitary harm. It is a severe humiliation to someone to be denied a service by a public-facing business, a public accommodation that promotes its business to the public on the basis of a protected status, on the basis of sexual orientation. What's your reaction? This is unlike an artist just practicing and then selling wares, and it's also unlike providing all the forks for a wedding. So it has less of a commodity component, for example, this service, than some. And it has a very plausible religious component. And so your opponent has suggested that there might be a subset of businesses that have a peculiarly expressive component and that might, where there is this religious concern, have a somewhat different standard applied, that that would constitute the narrow tailoring that would satisfy the strict scrutiny if we were to get there. What's your response to that? There are major line-drawing problems with that, Your Honor. You couldn't just exempt plaintiff, it would have to be every wedding photographer, and then it wouldn't just be wedding photography. There are many, especially in the wedding context, there are many wedding vendors that use creativity in the service that they provide. So the florist, the chef, the cake makers, we know that from Masterpiece Cake, the wedding invitation designers, the videographers. I think it's very unusual. No one would hire a videographer just to plant the video in one place and record it. You obviously hire them, and they go around. And it's the exact same as the wedding photographer. All of them could say, well, what we do is, you know, celebrate the wedding, and we're personally opposed to same-sex marriage. Your opponent has severe line-drawing problems, too, because, correct me if I'm wrong, they mentioned speechwriter, but someone who writes songs, someone who's a ghostwriter, someone who edits books, a tattoo artist, all those individuals, if they said, look, I want to use my creative skills to promote certain values, certain Christian values, the state of New York would say to all of those people, oh, no, no, no, you can't pick and choose how you're going to use your creative skills.  All those people would be unable to, the content of a tattoo, a portrait artist, if they decided, I want to, let's use tattoo, I just want to do Christian tattoos, I want to promote Christian values, the state of New York would say, no, no, no, no, if you are in the tattoo business, you have to open up your skills and expressive content to whatever someone wants, right? No, Your Honor, if you wouldn't create a message for anyone, then you don't have to create a message for someone with a protected status. Yes, so that example isn't correct. That's what this case is about. Ms. Carpenter will not create a message of celebrating same-sex marriage for anyone. It doesn't matter whether they're straight, whether they're gay. Whoever asks her to do that, she will not do it. All that New York's public accommodation laws require her to do is to provide the service of wedding photography. They do not dictate the content of that photography. Now, I grant you that one of the conventions... The same service wouldn't necessarily provide creating blog posts or the personal comments or participation in the service that she would provide possibly to a Christian wedding that was between members of the opposite sex. Is that right? The same service is fundamentally just providing the photographs. It's not all the add-ons, the blog posting and the other... I mean, she says those are a complementary additional service. I mean, I suppose there could be some amount of leeway there, but the important point is that if there's... No one can compel her to say on her blog, I support same-sex marriage, and in fact she would be perfectly free to express her religious belief that marriage should only be between one... Well, but I think the question is if she does provide a service that blogs about the weddings that she photographs, does New York require her to comparably blog about same-sex weddings that she photographs? Yes, to the extent those... Not to create a message that she disagrees with, but you can see the text in the record. She has a brief description of the couple, and if that's part of the service, how they met and so on, and if that's part of the service she provides, she has to provide that service on equal terms. No one can compel her to... So the Muslim tattoo artist who only wants to have tattoos, make tattoos that celebrate Islam, a Christian walks in and says, I want you to... I want a crucifix. A Muslim tattooist says, I'm sorry, I only do... I only celebrate Islam. Is that good in New York? Yes, that is not a violation. So if the tattoo artist said, I'm not going to... You're a Christian, I'm not going to provide you with a tattoo that I provide for everyone, that would be a violation. The example that Your Honor just offered, that is not a violation, because... You think that's different from this case? It's very different from this case. What she is saying is that she will not provide photography based on, you know, based on a protected status, which is sexual orientation. And if I could, Your Honor... I'm sorry, isn't she saying that part of her service is these additional expressive components, like the blog post and like the personal involvement, and she takes a very personal and intimate approach to the service itself. And that's part of what she is offering to the public. As do many, many service providers, Your Honor. There are many services that are expressive in the wedding context and elsewhere. I also think there's a line drawing with respect to protected statuses. My colleague said that, well, this might not apply to an interracial marriage. A photographer who had an objection to an interracial marriage. I don't know that that's necessarily true. I mean, the Supreme Court has also said that gays and lesbians are entitled to dignity. So if there's a First Amendment exemption here, I don't know why it wouldn't apply to an interracial marriage. I do want to focus on this narrow, tarrowing issue, because isn't the State of New York concerned that the district court essentially is saying, because creative artists are all unique, that you can never have basically narrow, tarrowing, doesn't that? They're subject to more regulation then because they're all unique. And again, you can apply that to every category of creative expression. Isn't that troubling to you? That wasn't what the district court was saying. So let me explain. What the district court was saying was, there was this proposal that one way of cabining this rule is that the more generic items, and this came up in the masterpiece cake context, you know, those, you know, the off-the-shelf wedding cake, that would be provided to same-sex weddings. But where the cake maker used really customized the cake, then that would maybe be the subject of an exemption. And what the Tenth Circuit said in 303 Creative, and I think this is very important, is that if you had a distinction between, you know, sort of off-the-shelf generic items, those are generally available. But the more narrowly crafted items, or the more unique items, those might or might not be available to disfavored groups. That that would be essentially an intolerable situation. That would not meet New York's compelling interest in ensuring that all persons, without respect to their protected characteristics, have full and equal access to goods and services. A slightly different topic. Can you tell me what the Unwelcome Clause covers that the Accommodations and Denial Clause does not? Yes. So the Denial Clause says you can't, you know, announce that you are going to deny service on the basis of a protected status. You can't put up the sign that, you know, straight couples only. And the Unwelcome Clause says you can't essentially try to discourage people from patronizing your business by maybe not outright saying you're going to deny them service, but stating your objection to them in such strong terms. And, in fact, the Unwelcome Clause that New York has, that's very similar to public accommodations. I mean, most public accommodation laws have some version of an Unwelcome Clause. I mean, the Denial Clause talks about, has the effect, I think it uses that language as well. So I'm still not totally clear, as a statutory construction matter, what fits under Unwelcome. But just as you've stated it, so you said that Ms. Carpenter can express her views about marriage. The state wouldn't consider that as falling within the Unwelcome Clause? It would not. The ordinary expression of a person's religious belief or objection to same-sex marriage does not run afoul of the Unwelcome Clause. So the Unwelcome Clause is, it's not just straight couples only, but gay couples, we really don't want to serve you. That would be a violation of the Unwelcome Clause. Well, how about I oppose gay marriage? That is not. Now, one's personal beliefs could be put in a highly objectionable or hyperbolic form and that could then at a certain point violate that clause. But what Your Honor just described would not violate the Unwelcome Clause. And indeed, persons would be perfectly free to express their religious objection publicly on the website and to their customers. What they can't say is, but I don't want your business. Right, which is what's covered by the denial clause, right? Yes, and again, the Unwelcome Clause would be, it's not just that I... Can you give me an example of anything that would fit under the Unwelcome Clause that wouldn't fit under the denial clause? I really don't think that I can provide the right service because, you know, to gays and lesbians because I feel so strongly that this is such an abhorrent thing. So something like that, that's not just a flat denial, right? It's not saying I won't do it. It's trying to discourage. Isn't that to the effect of the accommodation will be denied? It's not saying it will be denied. It's saying I really don't want to do it and I'm trying to discourage you from hiring me. That's what it's doing. So I think that falls somewhat short of just a flat out denial. And that's what the Unwelcome Clause was meant to capture. And indeed, in all other contexts, again, Unwelcome Clauses are very common in public accommodation laws. And they are meant to, you know, when it's just something that's just short of a flat out announcement that you're not going to provide service, that that too is covered. So you can't actively try to discourage someone from patronizing your business because you don't approve of their race, their religion, or their sexual orientation. But so, you know, posters on the front of the store or on the website advertising that express Ms. Carpenter's views about marriage as between a man and a woman and opposition to same-sex marriage, there's no circumstance in which New York would apply the Unwelcome Clause to that. That's right, Your Honor. That would not violate the Unwelcome Clause. Now, you know, if someone has a history of denial of service, there could be certain contexts where maybe some type of clarifying statement is required. But ordinarily, and I insist on this, ordinarily the expression of someone's religious opposition to same-sex marriage would not violate the Unwelcome Clause. Thank you, Mr. Lane. We have Mr. Hussain by way of Zoom. Mr. Hussain, can you hear me okay? Yes, Your Honor. All right, you can proceed whenever you're ready. You have four minutes. Thank you, Your Honor. May I please the Court? Hi there, Hussain. For appellee to Sherman County District Attorney. New York has a compelling interest in eradicating discrimination of all kinds, and indeed, the New York statute is intended to do just that. We ask the Court to uphold the district court's ruling. Here, the New York anti-discrimination laws are designed to ensure that all customers are served by businesses and businesses open to the public are on equal footage without regards to the business's message. Sherman County is a rural county with a population of about 80,000, and creating an exemption like the one Lane was suggesting will have a chilling effect in our community. Being a small community, we do not have thousands of photographers in our community where the same-sex couples could go to hire. If photographers like the plaintiffs deny the service on the basis that there is someone else out there to do the job, it will have a rickling effect in our community. Also, creating this exception would also have a profound effect throughout the state and essentially making this New York statute difficult to administer. What plaintiff is challenging is accommodation clause prohibition on limited menus. Well, Mr. Singh, how do we know that? How do we know that? Because there's no record, right? This was all on a motion to dismiss. This is basically including the impact of this, how many other photographers there would be in any particular county in New York. Isn't that really unknown? It's not part of the record, right? Yes, Your Honor. But being that from the plaintiff's complaint itself, the plaintiff has suggested that she has already denied at least 7 patrons. Are you aware of any case where strict scrutiny has been satisfied without any record based upon pleadings? A court anywhere has found strict scrutiny satisfied. Are you aware of any case in that category? No, Your Honor, but New York statute is content-neutral and it's designed to look at just the conduct itself, and it's regulating the marketplace. I submit that it survives the strict scrutiny level, that the statute is nailery tailored to serve the New York compelling interest to protect the marketplace of the state when any person comes into the marketplace, it is providing a service to all patrons and not discriminating against any one protected class. So the New York statute does not permit businesses to offer a limited menu of goods and services and customers on the basis of that status and that protected categories. Similarly, the New York statute laws only applies to those businesses that chooses to provide services and goods to the public and are open to all customers. Absent the protections of New York accommodation laws, members of disfavored groups would be subjected to humiliation and exclusion from society on a daily basis and suffer community-wide stigma. They're being treated as social outcasts as treated in masterpiece. The DA's position on this case, on the issues are in line with the state's presentation and that the appropriate standard meets intermediate scrutiny and survives a strict scrutiny level of narrowly tailored and compelling the state's interest. All right, thank you, Mr. Hussain. Mr. Neihardt, you have three minutes in rebuttal.  Just two primary points in rebuttal here. The first point is that Hurley controls this case. New York tried to distinguish Hurley by first saying that Hurley applied to private associations, but the state court of Massachusetts found, as a matter of fact, that the parade was a public accommodation and the 10th Circuit, the 8th Circuit, and the 11th Circuit have all applied Hurley in the context of for-profit organizations like Ms. Carpenter and have found compelled speech in those instances. So that distinction doesn't work. Next, New York also explained that it cited cases on page 49 of its brief talking about status conduct distinctions, but that's not the distinction we're urging here. The distinction we're urging here is status and message. Hurley said that there is a difference between objecting to the message that a speaker is asked to convey as opposed to objecting to the status of a particular person. So let me just press on that. A photographer says I'll photograph any religion, but I won't photograph anyone wearing a yarmulke. I mean, I think you've already said under your theory the religious-based, the secular religious, objection to a religious-based message is fine, but assuming I don't agree with you on that, doesn't that distinction fall down if I say I won't discriminate on the basis of religion just on the message conveyed by the wearing of a yarmulke? If it is an actual message-based distinction, then I think Hurley addressed that, too. And Hurley said that even if there's some overlap between the status and the message, the speaker, if it's a legitimate message-based objection, can still have a First Amendment right. So in Hurley, for example, the GLIB group, there's clearly a status overlap between the message that they wanted to convey, but the court said that the First Amendment protected the parade to prevent it from conveying messages that it disagreed with. You don't see a difference between running a parade as a public accommodation, a one-time event, and running a business on a daily basis, year in, year out? No, Your Honor. I think the First Amendment applies to for-profit organizations. As Judge Bianco said, Tornillo involved a for-profit organization. Pacific Gas and Electric involved a for-profit organization. So the First Amendment applies. Anti-discrimination obligations apply in different ways, with different force in each of those two very different settings, don't they? I don't think so, Your Honor, because New York has said its interest is generally preventing discrimination, and I think that interest would apply equally in non-profit and for-profit organizations, the context. Here, though, that interest doesn't apply because Ms. Carpenter objects to the message and not the person. A couple other things since my time is running out. I want to say that Berry itself acknowledged that in the First Amendment context, mind-drawing situations can be difficult, but it's the job of the court and the Constitution to protect even difficult situations. The final thing I'll say is that the county admitted that it has no evidence to support the compelling interest, and there has been no court that has said that the government can meet strict scrutiny at the motion-to-dismiss stage when First Amendment principles are at play. So in sum, we would ask this court to reverse the district court's opinion and to grant her request for a preliminary injunction. Thank you. Thank you, too. All of you are reserved for decision. Have a good day.